Daniel Cirando, Syracuse, N. Y., for plaintiffs; Gabriel T. Pap, New York City, of counsel.

Justin J. Mahoney, U. S. Atty., Albany, N. Y., for defendant; Mitchell Rogovin, Asst. Atty. Gen., Donald R. Anderson, Marvin Joseph Garbis, David A. Wilson, Mark S. Rothman, Attys., Dept. of Justice, of counsel.

**Jules R. GULDEN and Edmee P. Gulden, Plaintiffs,**

v.

**The UNITED STATES of America, Defendant.**

**Civ. No. 8852.**

United States District Court
N. D. New York.

Nov. 30, 1967.

PORT, District Judge.

### MEMORANDUM-DECISION AND ORDER

The plaintiffs, husband and wife, have brought this action against the defendant to recover income taxes in the total sum of $6,164.20 claimed to have been erroneously collected for the years 1954 through 1957 inclusive. The plaintiffs duly and timely filed joint income tax returns for the years in question showing total liability in the amount now claimed. Claims for refund were duly and timely filed; the claims for 1954 and 1955 were disallowed on or about January 1, 1960; more than six months passed between the date of filing of claims for refund for the years 1956 and 1957 without either allowance or disallowance; and

the suit herein was instituted timely. The court has jurisdiction over the action.

The claims for refund are based upon an alleged net operating loss in the taxable year ended December 31, 1952, in an amount sufficient to wipe out the taxes for the years in question. The net operating loss was not cited in 1952 or on subsequent returns. It was first alleged when the claims for refund were filed, and was said to have resulted from a 1952 confiscation of the plaintiffs' interest in four parcels of realty in the city of Budapest by the Hungarian government.

It has been stipulated that any property interest owned by the plaintiffs on February 17, 1952, would have been confiscated by the Hungarian State on that date pursuant to the Hungarian Nationalization Decree of February 17, 1952 (Decree of Legal Force No. 4/1952 of the Praesidium of the Hungarian People's Republic on the Nationalization of Certain Real Property).

The defendant claims that the plaintiffs' interest had been confiscated as abandoned property on August 27, 1948, the effective date of Law No. XXVIII of 1948.

Both sides offered expert testimony concerning the relevant Hungarian Laws, Decrees, Land Records, and their construction and effect as they related to the plaintiffs' property. The plaintiffs owned fractional interests in the four properties ranging from 2½% to 50%. All of the properties were commercial or rental apartments.

In view of the decision herein, it is not necessary to trace the manner in which plaintiffs acquired an interest in the properties.

Mr. and Mrs. Gulden left Hungary for Switzerland on December 9, 1944. They never returned. They immigrated to the United States from Switzerland in 1948 and respectively became naturalized citizens of the United States in 1953 and 1954.

The most pertinent decrees and Hungarian laws, the construction of which gives rise to this dispute, commence with decree No. 10490/1945. (This was a decree issued by the Hungarian government pursuant to authorization of the Provisional Diet which was in effect between the Nazi occupation of Hungary and the subsequent Communist take-over of the government.) The 1945 decree created a Commissioner of Abandoned Properties whose function, among others, was to establish whether particular property was to be regarded as abandoned, locate and preserve it, supervise the curators appointed for the owners of the abandoned property, manage abandoned real and personal property, put the abandoned property to use, aid persons who lost property as a consequence of war conditions, and adjudicate claims for reinstatement of persons claiming ownership of abandoned properties.

The purpose of this law was to conserve for the benefit of the true owners properties which were deemed abandoned under the law. Decree No. 10490/1945 defined "abandoned property" to include "all assets which as a consequence of the conditions of the war got out of the possession or control of their owner or lawful Possessor * * *," unless an ancestor, descendant or spouse of the owner remained in Hungary with a written power of disposition of the property. The 1945 decree prevented the alienation or encumbering of abandoned properties without the permission of the Commissioner.

The plaintiff Jules Gulden testified that their property was declared abandoned under the 1945 law. His testimony indicating abandonment of all of their property is buttressed by a decree made by the Commission for the Liquidation of Abandoned Assets on April 22, 1948, declaring them to be abandoned under the 1945 law.

After the 1945 decree the government moved steadily toward the nationalization of virtually all property. In pursuance of this policy the Hungarian Parliament

enacted Law No. XXVIII of 1948 on the Settlement of the Problem of Abandoned Properties. The rights of the plaintiffs to an operating loss in 1952 largely depend upon a construction of this law.

Title to property regarded as abandoned under this law devolved to the State without compensation on August 27, 1948. If the property involved in this case was confiscated then, the plaintiffs did not sustain a loss in the calendar year of 1952 which could be carried forward to give them the credits for the refunds claimed in this suit.

■ From the testimony produced on the trial, from observation and appraisal of the expert witnesses, and from an examination of the documentary evidence, I am convinced that it has been established by a fair preponderance of the evidence that all of the real property owned by the plaintiffs was confiscated by the Hungarian State prior to 1951 and further that Law XXVIII of 1948 was self-executing and brought within its scope as of its effective date all property decreed to have been abandoned under the 1945 decree. Plaintiffs' property, found to have been abandoned under the 1945 decree, was subject to the provisions of the 1948 law and title devolved to the state on August 27, 1948, with the right in the Guldens to petition to terminate the status of abandonment. However, the pendency of their petition (one was actually filed) did not restrict the Treasury's right to alienate the property. If they had received a favorable decision terminating the status of abandonment, they were entitled at the option of the Treasury to a return of the property or to reimbursement for its value. The construction placed on these provisions by the defendant is adopted by the court. The option to return the property or to pay its value to a successful petitioner indicates, *a fortiori*, a taking of the property leaving open only the question of whether or not compensation should be paid.

Exhibit O clearly establishes that Doctor Krause, the plaintiffs' representative in Hungary, petitioned under Law XXVIII of 1948 for an exemption on behalf of the plaintiffs under that law. There is no evidence that Doctor Krause's petition to terminate the status of abandonment was ever granted.

Under the circumstances, while it clearly and regrettably appears that the plaintiffs' property interests were taken by the Hungarian Government without compensation, the confiscation occurred in 1948 and it accordingly could not result in a net operating tax loss to them in 1952. It is therefore not necessary to resolve the government's contention that even if the loss did occur in 1952 it was not in an amount which would wipe out the plaintiffs' tax liabilities for the years in question.

## MOTION TO REOPEN

After the submission of the case, but prior to its determination, and on or about August 14, 1967, the plaintiffs filed a motion "To Accept Newly Discovered Evidence." No notice of motion bringing the matter on for argument was filed. However, the court by correspondence with the parties arranged for the submission of the motion on papers and memoranda of law. The matter was finally considered as submitted on November 3, 1967.

The newly discovered evidence consists of a letter from a Hungarian lawyer to the plaintiffs' attorney enclosing what purports to be a response by the Deputy Chairman of the Central District Court at Budapest to an inquiry from the Budapest lawyer, explaining item 3 on exhibit U and supplying item 5 on exhibit U. Item 5 had been obliterated after its certification by the "Land Register Rapporteur."

Exhibit U is an extract from the Land Records pertaining to the ownership of one of the premises in question. The extracts are made up to set forth the relevant instruments on record relating to the ownership of the named parties with reference to specific realty. The part of the abstract indicating the ownership record, under "B," abstracts the

instruments on file in chronological order, numbered serially commencing with 1. The consecutive serial number of any instrument not abstracted in the chain of title is omitted, with the break in the serial numbers indicating the omission.

On the trial the plaintiffs contended that item 3 indicated a *sale* of a 50% interest in the subject premises by Mrs. Gulden's mother, Mrs. Gerbeaud, to the Hungarian State. The defendant contended, and apparently still does, that Mrs. Gerbeaud's interest is not reflected in the abstract, and that item 3 is the recordation of the abandonment of Mr. and Mrs. Gulden's interest under the 1948 law. The defendant further claimed that item 4 is a superfluous recording of the transfer of that same interest to the Hungarian State pursuant to the 1952 statute.[1] The plaintiffs have always claimed that there is no relationship between items 3 and 4 since item 3 relates to Mrs. Gerbeaud and item 4 to Mr. and Mrs. Gulden.

The explanation offered in the newly discovered evidence supports a claim that item 3 indicates the *socialization* of the interest of Mrs. Gulden's mother in the property abstracted in exhibit U. This is at odds with the trial testimony of the plaintiffs that Mrs. Gerbeaud's interest in Eszter Utca 2 was sold to the Hungarian State rather than lost by socialization. The word "atszallas" is used in the original document to describe the nature of the transaction set forth at item 3.

"Atszallas" indicates devolvement or confiscation under Law XXVIII; a sale would be indicated by the word "vetel."

The certificate upon which the plaintiffs rely as newly discovered evidence also allegedly supplies the obliterated material under item 5 of exhibit U. The certificate states that that item "referred to the Army Placement and Utilization Department No. 12 having been at that time [1953] the Administrator of the said property, which in the meantime had entirely been socialized." The certificate fails to tell when, "in the meantime," the socialization took place.

While the land records have considerable probative force in determining the ownership of premises at a particular time, nevertheless, since title under Hungarian law, as under our law, can pass without recordation, those records are not conclusive. The Hungarian State, through its confiscatory statutes and decrees, gave itself ownership of and title to confiscated property without the niceties of recording.

■ The defendant properly contends that the proffered newly discovered evidence is not admissible since it has not been properly authenticated. Rule 44(a) (2), F.R.Civ.P. The plaintiffs' contention that the proffered evidence (which was not even in existence until a year after the trial), comes within a stipulation admitting specified documents on the trial is so lacking in merit as not to require discussion.

The motion to reopen is denied.

Assuming arguendo, however, that it is admissible, it would in no way alter the findings or conclusions reached herein.

### CONCLUSIONS OF LAW

1—The court has jurisdiction of the parties and the subject matter of this suit. 28 U.S.C. § 1346(a) (1).

2—The properties, upon which the plaintiffs claim a net operating loss, were confiscated by the Hungarian

---

1. The 1952 Nationalization Decree lent itself to much easier recording since it was directed at all property of six rooms or more, while the 1948 statute taking property was directed at certain classes of people only. The confiscation decrees under the 1952 act were apparently blanket decrees since item 20 on the abstract relating to the Palais Gerbeaud shows the same decree number (4741/1952) under the 1952 act as is shown under item 4 in exhibit U transferring the ownership rights in the Eszter Utca property.

Government in 1948 pursuant to Hungarian law.

3—The plaintiffs did not sustain a net operating loss in 1952, nor were any of the properties formerly owned by the plaintiffs in the City of Budapest, and referred to herein, confiscated by the Hungarian State in 1952, because the plaintiffs' interest in said properties had been extinguished by confiscation earlier.

4—The action herein should be dismissed on the merits and judgment should be entered in favor of the defendant accordingly.